# *EXHIBIT A*

A. No.
**Q. Did you receive any discipline at Bradford Dyeing either the first time or the second time?**
A. Oh, no.
**Q. Okay. And did you receive any discipline during your last stint at Fleet?**
A. No.
**Q. Okay. Have you ever brought a lawsuit against any employer other than this one before?**
A. No.
**Q. Have you ever testified in a deposition or a trial in the past?**
A. No.
**Q. Was there any courtroom testimony involved in connection with your divorce?**
A. Oh, well, I -- yeah, I mean, I got up -- to get on -- to go through the divorce you sit on the witness stand, he asks you a series of questions and it was all predetermined before we even, so I guess that would be a -- is that considered testimony? I mean.
**Q. I'm just asking -- I'm just trying to find out --**
A. Yeah, I did. I did sit on a witness stand on my divorce and just answered the questions yes or no.
**Q. Okay. Tell me about what medications you are on**



**today.**
A. I am on Lipitor for my cholesterol. I am on Rebif, R-E-B-I-F-F, which is a, an injection I take, I give to myself three times a week to -- this medication tries to slow down -- well, unproven but indications are hopefully you can slow down the effect -- the progression of MS. I take Prodigal, P-R-O-D-I-G-A-L, and that is -- it's not an amphetamine but because one of the side effects of the MS is, you know, extreme fatigue and this gives you more -- will give you more -- gives me more impetus.
**Q. Did you take Prodigal today?**
A. I took a half. I take a half in the morning and a half in the afternoon.
**Q. Do you know the dosage?**
A. Yes, 200 milligrams so I probably took a hundred this morning.
**Q. Okay. And did you take a Rebif injection today?**
A. I have to do that this afternoon. I do it Monday, Wednesday, Friday.
**Q. Okay. And other than Lipitor, Prodigal and later on Rebif, are you on any other medications right now?**
A. No, well, I do have a prescription for Viagra.
**Q. Anything else?**



A. No, that's it.
**Q. Are you -- do you -- are you on any medications currently that affect your ability to answer questions truthfully and accurately today?**
A. No.
**Q. Okay. Do you have -- tell me about your present symptoms of MS.**
A. I -- let me see, where do I start. I have -- I obviously have an energy level issue. Like I just took a fatigue class on MS and they talked about that fatigue and MS as like a different -- what a normal person would consider fatigue. It's like the difference between an atom bomb and a firecracker. And it's so true. But anyway, that's -- and then I have -- I have -- I can have difficulty walking sometimes. I mean, that varies. And I have -- I'm going through physical therapy right now to try to help that balance issue. And my gait issue. And that's basically -- that's basically it right now. And then I have urinary tract and bowel movement issues, too.
**Q. Anything else?**
A. I can't think of anything right now.
**Q. Do you feel that you have any present symptoms that**



**affect your ability to answer questions truthfully and accurately today?**
A. No.
**Q. Tell me about why you resigned from Fleet in 2003?**
A. My MS was starting to progress -- I could tell that things were changing. And it was during the last year of employment at Fleet. And they were changing and I was working through it.
**Q. You weren't working through it?**
A. I was working through it, forcing myself to go, you know, to push myself through it. And I had a -- you know, I was dating my current -- my wife and -- at the time. And I told -- you know, I told her the things that were going on with me with, you know, I was having difficulty walking in the morning and, you know, I was having, you know, bowel movement issues and, you know, she -- and I was emotionally, you know, really, really stressed out. And, you know, I was -- I could feel myself going downhill. And I -- you know, at one point in time in the summer of that year, sometime, I don't know when, you know, I did talk to Steve. I told him that, you know, I -- you know, it was starting to -- you know, things were picking up on me. He goes, "What do you want to do? Do you want

to, you know, go on disability? Do you want to do this?"

I go, "I don't know what I want to do."

So he goes, "Why don't you get back to me when you figure out what you want to do."

I go, "All right."

So I -- you know, basically it was the same old, same old as far as, you know, I was working every day and stuff and I would force myself to go through it. And try to be the good dooby. I -- I wanted to -- like my wife said, she goes, "You know, before a job kills you, you better -- you should really seriously think about doing something, like quitting." I said all right. So I --

**Q. Your wife said that?**

A. Yeah. She was in favor of me doing it because I was a basket case. So I -- you know, I don't know the exact date, it's probably on here, where I resigned. Where I gave my -- I delivered my resignation. I know it was at least a month ahead of time. And I told him I was going to be resigning. And from that point on, you know, they just started -- plus I was getting married on October 18th so I was going to be out the third week of October. And, you know, they



immediately started peeling work away from me over the next couple of weeks to get to -- you know, then I went out, got married, went on my honeymoon, and the last week of work I was more or less -- like every -- all the -- most of the functions I was doing had already been given to somebody else. They were -- you know.

**Q. Because they knew that you were leaving?**

A. Oh, yeah, I gave them a month's notice, yes. And most of the jobs in there, other people had -- most of what I did on the incentive side, there was a woman there who actually came back to work at Fleet who was the one who was there -- who got laid off. She was there so a lot of that work went to her.

**Q. And who was that?**

A. Claire Halliday.

**Q. Let's back up a little bit because we just went through quite a bit of material. You started talking about -- I believe what you testified was you felt yourself going downhill. Tell me more about that. Why did you feel yourself going downhill?**

A. Well, I could feel the effects of the MS. Like I noticed -- I noticed, like I parked in the Convention Center garage and I could tell, sometimes I couldn't



get into -- I couldn't walk into the bank because I had to go to the bathroom so bad, I'd have to duck into the Westin to go to the bathroom. And there were many mornings where I was having -- I was having some difficulty walking in. And I knew things were changing.

**Q. And tell me about your difficulty walking, what did that difficulty entail?**

A. Like, you know, losing complete control of your legs. Hard to explain. Like I have some -- I have that going on right now. It's -- like you can trip, you have this thing called drop foot, you can trip on a curb and, you know, you just like -- getting one foot in front of the other, walking, sometimes you just lose track of it, you don't know where it is. It's a strange -- it's hard to even explain.

**Q. Okay. And so that probably affected your balance and coordination and things like that?**

A. Absolutely. I think it's all related. You know.

**Q. You mentioned that you had a conversation with Steve Lacroix in the summer of 2003. Tell me more about that conversation. Do you remember when it was, more specifically than in the summer?**

A. I can't, you know -- I don't know. I don't -- it



was...

**Q. And was it just you and he that were in the room?**

A. Yes.

**Q. And tell me what was said exactly to the best of your recollection.**

A. I told him about what I told you about my symptoms. And --

**Q. Did he know that you had -- I'm sorry to interrupt you but did he know that you had been diagnosed with MS?**

A. Oh, yes.

**Q. How did he know that?**

A. I told him that on numerous occasions.

**Q. Okay.**

A. He knew that. I mean, that was -- that was -- and it was one thing that -- it was like a -- you know, one thing about my MS is I, I never really wanted to publicize it so, you know, it was like a -- it was like, kind of like a pact where, you know, he wasn't going to -- even when I was leaving, I said I didn't want to publicize -- I didn't want anybody to know that was why I was leaving and so, it was just me going on to do other things. You know, same old corporate response. But he, you know, I know he didn't publicize that.

think they could be -- and I can't tell you why I thought this way, I just didn't think they could be paid out simultaneously. I thought you had to wait for one to end for the other one to begin. So I said okay, I'm going to go on TDI, that's good for X amount of weeks, so I have X amount of weeks to apply for a short-term disability that I paid for in Fleet.

**Q. When did you apply for TDI?**

A. Within very shortly after I -- very shortly after I left work. Within a week or two. I'm not exactly sure of the date.

**Q. And you started receiving benefits when?**

A. Almost immediately. Well, they have -- I think they may have a two-week waiting period so, so I received benefits from then until, I don't know, February, the end of February.

**Q. So from November through February you received TDI?**

A. Yes.

**Q. And how much did you receive?**

A. 600 a month.

**Q. And how did you know to -- how did you know to apply for TDI?**

A. Well, I just -- you know, word of mouth. I know a friend of mine who had been on it and he had mentioned



it to me before I had left. I said, you know, I'm going on TDI, I'll do that.

**Q. You testified earlier when I asked you about why you felt entitled to short-term disability, that you partook in those benefits. What did you mean by that?**

A. Well, I paid into them.

**Q. Mm-hmmph. But you didn't apply for them while you were still employed by the bank, right?**

A. Well, I didn't do it by October 31st of 2003, correct.

**Q. Did you receive a copy of the short-term disability policy while you were at Fleet?**

A. I can't say that I did but I know I did get one after the fact. I -- you know, I mean, to get the policy, you can go online and look at it on the Intranet.

**Q. Did you ever receive a handbook or a personnel manual while employed by Fleet?**

A. Regarding all benefits or just --

**Q. Regarding the different policies.**

A. Yeah, yeah, but I don't know how, you know -- I don't know how deep they went into like all the idiosyncrasies of the different programs but, yes, we received them. Every year we received a benefits package.

**Q. Do you know if there was a short-term disability plan**



**policy in the handbook?**

A. I can't -- no, I don't know if there is or there isn't.

**Q. But you recall that it was available on the Intranet, right?**

A. I believe it was, yeah, I think all the benefits are available out there.

**Q. While you were employed by the bank, did you ever go on the Intranet to review the short-term disability policy?**

A. No.

**Q. While you were at Fleet, did you ever review the handbook to see if there was a short-term disability policy in the handbook?**

A. No, that was the least of my worries at that time. You know, it was more like, I worried more about health insurance at that time as opposed to things that I didn't think I'd ever need. No, I didn't. The answer is no.

**Q. What is your understanding of what short-term disability is?**

A. Short-term disability, my understanding, is a monetary supplement for, for a person when you're not able to work for short-term disability. You know, however



that's outlined, you know, you get X percent, you know. And then, you know, for whatever time period that exists. Just like -- I look at it like -- I know TDI pulls up credits. Short-term disability I thought was more like a fixed thing based on your income -- I mean your salary.

**Q. And why did you sue the bank and Liberty Mutual for short-term disability benefits?**

A. Because my -- because my claim was rejected.

**Q. Do you feel it was wrongfully rejected?**

A. No. I mean -- yes I mean. I mean, well -- I think it -- I think -- yeah, I believe it was wrongfully rejected.

**Q. Why do you believe that?**

A. Because -- because I -- you know, I believe I, you know, I have a legitimate reason for going out, you know, on disability -- well, in my situation I'm leaving work. I mean, it's a legitimate reason for leaving and, you know, I was -- I just thought that, you know, they would honor that, you know.

**Q. To your knowledge is one of the conditions of receiving short-term disability having a legitimate reason for leaving?**

MR. GIANFRANCESCO: Objection. You can

A. Yeah.
**Q. Okay. I would like you to turn to the last page of that exhibit. And looking at the last entry where it says, in bold, 12/11/2003, 11:25 a.m., Claim Note 2.**
A. Oh, it was telephone.
**Q. It says "Note Subject: Telephonic intake. Other Subject: Medical condition. Text: Multiple sclerosis."**
**Does that refresh your recollection about the date that you filed the claim with Liberty Mutual?**
A. I -- I still don't remember doing it but if -- apparently -- so apparently I did do it over the phone.
**Q. But you still don't remember?**
A. But I still don't remember doing it.
**Q. What about the date, is that -- to the best of your recollection, is that date accurate for the date you filed?**
A. Probably.
**Q. Did you ever -- you mentioned that you had some communications with Brooke Stewart from Liberty Mutual. Did you ever have a conversation with her in which she advised you that you were not eligible for benefits since you resigned?**



A. It wasn't her. Somebody else at Liberty Mutual said that to me but I don't remember the woman's name. Brooke Stewart was like a case manager or something, and she basically just gathered the information together, from what I understood, so she -- if she needed, like, documents information, whatever, and then it went into some, you know, some department there. And then whoever did -- somebody called me from there and told me -- and I don't know who it was -- and told me that, you know -- you know, I wasn't an employee, that's why I got rejected, or -- you know, and I don't remember all the particular, who said that up there, but I know it got rejected up there for that reason.
**Q. Okay. Why don't you tell me, who told you to apply -- did anyone tell you to apply for short-term disability benefits?**
A. I think it's just something that occurred to me after the fact. Because, you know, I realized I had short-term disability. And then I did, you know, whatever -- I did whatever I had to do to apply for it when I realized I probably should. I don't -- I can't, I can't remember.
**Q. You don't remember if, if it's something that occurred**



**to you or if it's something that someone mentioned to you?**
A. I -- no, I don't remember. I don't know, I honestly don't know.
**Q. Tell me what you remember about conversations that you had with Liberty Mutual employees about your claim?**
A. The only thing I can remember is talking to that Brooke Stewart up there and working with her and getting all the information that was needed for my particular case. And then they sent me like something that was notes about my case. And then they sent -- and then they sent me a determination letter. And it was like a different person. It wasn't Brooke Stewart, I don't think. But she did -- she did say something. I think she may have sent something out that denied it initially, I'm not sure.
**Q. Right, I want to know about conversations that you had, I'm presuming they would be phone conversations so why don't you see if you remember any phone conversations you had with Liberty Mutual people?**
A. The only conversations I remember having with them was, like, working with Brooke Stewart and getting what I needed, you know, whether it be doctor information or whatever, and what they were missing or



lacking, and checking up on the case or whatever. And then some other woman -- talking to some other woman about my case after it had been rejected. And then she stated the thing about not being -- the thing in the policy about not being an employee to me. And I said, well, I said, we probably shouldn't be talking about this right now because I wanted to -- I wanted to look into it more from a legal standpoint. You know, I didn't want to get into any detailed conversation with her about the who's, what's, when's or why's.
**Q. So you had a conversation with Brooke Stewart about gathering information you needed for your claim?**
A. Right.
**Q. And then you remember another conversation with somebody else in which you mentioned that you didn't want to get too deep into it?**
A. Right. I said we shouldn't be talking right now because, you know, I have -- I -- you know, I have to do more leg work into finding out whether I should pursue this or whatever. Because I had already been rejected. I think I had a number, if you have a question about -- if you have a question about reject -- this claim being rejected, however it was

**Q. Right. And did you tell him that you didn't think you'd be able to continue on this at Fleet because of your medical condition?**
A. At that time -- at that time during the summer?
**Q. Yes.**
A. No, I didn't tell him that day.
**Q. When did you tell him?**
A. I just told him I was getting worse. I told him when I resigned in September.
**Q. Okay. And he discussed with you, I believe you testified, short-term disability benefits or whether you should apply for benefits?**
MS. GLICKSON: Objection.
**Q. Did he discuss that with you?**
A. In -- at one meeting, previous meeting he did.
**Q. Did he ever discourage you from resigning?**
A. He threw out options to me but he -- I don't know if he was discouraging me. You know, like the part-time -- he mentioned working part-time.
**Q. Did he -- at some point he in fact asked you for a written letter of resignation?**
A. At some point but I don't know exactly when that was.
**Q. Do you know why he asked for a written letter of resignation?**



MS. GLICKSON: Objection.
A. Should I answer that?
**Q. No. I'll rephrase the question. Did he tell you why he needed a written letter of resignation?**
A. Why he needed it?
**Q. Yes.**
A. No, I just thought it was like professional procedure.
**Q. And did anyone at Fleet ever discourage you from resigning?**
A. No.
**Q. Did he ask you what your plans for the future were?**
A. I don't think so but I don't recall.
**Q. And you indicated that starting in October your job duties were in fact being reduced?**
A. Yes.
**Q. And some of your tasks were reassigned?**
A. Yes.
MR. GIANFRANCESCO: That's all I have.
MS. GLICKSON: I don't have anything further.

(Whereupon the deposition was adjourned at 1:00 p.m.)

\---



CERTIFICATE

I, Lori P. Hamel, hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to Rules of Civil Procedure of the Superior Court, especially but without restriction thereto, under Rule 30(e) of said Rules; that the deponent was first sworn by me; that this deposition was stenographically reported by me and later reduced to print through Computer-Aided transcription; that the foregoing is a full and true record of the proceedings; and that a review of the transcript by the deponent was not requested.

IN WITNESS WHEREOF, I have hereunto set my hand this 19th day of August, 2005.

________________________________

LORI P. HAMEL, RPR, CRR

My Commission Expires 6/24/09